IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| v. | : | CRIMINAL CASE NO. |
| ANTONIO JACKSON, | : | 1:23-CR-280-02-JPB-JSA |
| Defendant. | : | |

**REPORT AND RECOMMENDATION**

This matter is before the Court on the Defendant's Motions to Suppress

Evidence and Statements. [297] [298]. As explained below, after an evidentiary

hearing, *see* Transcript [370] ("Tr."), the Court **RECOMMENDS** that these

Motions be **DENIED**.

**I.     FACTS**

These motions relate to a traffic stop of Defendant's car on August 1, 2024.

This stop was undertaken by the Georgia State Patrol ("GSP"), on the pretext of

traffic violations, but which was primarily at the behest of an FBI drug trafficking

investigation.

Prior to the traffic stop, the FBI provided the GSP with a summary of its

drug trafficking investigation involving Defendant. Tr. at 68-71. The FBI had

previously observed Defendant regularly traveling and delivering packages to a

suspected drug stash house in Atlanta operated by co-Defendant Roderick Battle.

*Id*. at 47-52. On one occasion in April 2023, agents observed another suspect leaving the stash house with a large duffle bag, which was later found to contain 22 kilograms of cocaine that included the Defendant's fingerprints on the packaging. *Id*. at 52-53. In May 2023, agents searched another suspected stash house operated by Battle and found substantial amounts of controlled substances and other evidence. *Id*. at 52-58. During the search of Battle's phones found at this and other premises, agents found multiple messages between Battle and Defendant discussing drug trafficking and collection of drug proceeds. Tr. 59-66. Agents also observed patterns consistent with drug trafficking at Defendant's residence, specifically where individuals would enter the residence empty-handed but would leave a short time later carrying packages. Tr. at 68.

Based on the foregoing information, the FBI concluded that it had probable cause that Defendant was involved in drug trafficking activity. Nevertheless, the FBI in August 2024 requested that the GBI assist in stopping Defendant's car based on independently-observed probable cause of another violation, so that the FBI could speak to Defendant about potential cooperation in the investigation. *Id*. at 68-69. Thus, on August 1, 2024, GSP Trooper Mullen pulled over Defendant's car at the FBI's request. Mullen explained that he observed and concluded prior to pulling over Defendant's car that the tint on the rear windows appeared to be illegally dark. *Id.* at 10-11. Trooper Mullen attested based on his observations and

training and experience investigating similar vehicles that Defendant's windows were likely in violation of Georgia law. *Id.*[1]

Upon stopping Defendant's car, Trooper Mullen briefly asked Defendant about the window tint, but then immediately asked Defendant to exit the car and handcuffed him. *Id.* at 13. Within approximately two minutes, FBI Special Agent Timothy O'Brien and others arrived to speak to Defendant. S/A O'Brien began by reading Defendant his *Miranda* rights. *Id.* at 71-74. Defendant verbally acknowledged his understanding of his rights, did not ask for any clarification, and subsequently spoke with the agents. *Id.* at 74-76. The agents did not threaten Defendant, unholster their weapons, or offer him any promises for cooperating. *Id.* S/A O'Brien terminated the interview and arrested the Defendant based on the perceived probable cause of drug trafficking upon concluding that Defendant was lying. *Id.* at 76-77.

Meanwhile, during this interview, Trooper Mullen deployed his K-9 drug sniffing dog to conduct an "open-air sniff" outside of Defendant's car. *Id.* at 14. Mullen testified that the dog ("Draco") has participated in "hundreds" of open-air sniff investigations to detect the odors of narcotics, and that he (Mullen) and Draco train together twice monthly and obtain re-certifications annually. *Id.* at 7. Mullen

---

[1] O.C.G.A. § 40-8-73.1 prohibits window tint that darkens windows by more than 32 percent. *See* O.C.G.A. § 40-8-73.1(b)(2).

initiated the sniff within six minutes of the traffic stop (during the FBI interview of

Defendant) and the procedure itself took less than a minute *Id.* at 15-16. According

to Mullen, Draco positively alerted to the odor of narcotics. *Id.* Mullen explained

the procedure and Draco's method of alerting, with reference to his dash-camera

video footage record. *Id*.

Based on this alert, Mullen and another trooper searched the car. They

found a small amount of marijuana, a firearm, approximately $5,000 in cash, and

three cell phones. *Id.* at 17, 31. This material was then provided to the FBI, which

had specifically requested that the Troopers collect any phones inside the car. *Id*.

## II.    DISCUSSION

### A. *The Traffic Stop Was Lawful*

Defendant first challenges the legality of the traffic stop. Probable cause is

not required to justify a mere investigative stop; reasonable suspicion is sufficient

for that purpose. *United States v. Powell*, 222 F.3d 913, 917-18 (11th Cir. 2000);

*United States v. Mikell*, 102 F.3d 470, 474-75 (11th Cir. 1996).  Specifically, to

briefly stop a vehicle, an officer must have reasonable and articulable suspicion

that the occupants are engaged in criminal activity, including traffic violations.

*Powell*, 222 F.3d at 917; *Terry v. Ohio*, 392 U.S. 1, 20-22, 27 (1968)); *see*

*generally United States v. Sharpe*, 470 U. S. 675 (1985). To show that in fact the

officers had reasonable suspicion, they "must be able to articulate more than an

'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'" *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (quoting *Terry*, 392 U.S. at 27).

Whether a detention or search is based on requisite levels of knowledge can in appropriate cases be viewed in light of the "collective knowledge" doctrine. This doctrine allows a court to impute the knowledge of one or more other officers to the one who specifically engages in the search or other conduct at issue. *See, e.g., United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (quoting *United States v. Blasco*, 702 F.2d 1315, 1324 (11th Cir. 1983)) ("Probable cause . . . exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed."). The collective knowledge of officers may be considered "if they maintained at least a minimal level of communication during their investigation." *Willis*, 759 F.2d at 1494 (citation omitted).

In this case, although Trooper Mullen had been provided a summary of the FBI's investigation and conclusions as to Defendant's drug trafficking, the most immediate justification for the traffic stop was the perceived window tint violation. Specifically, Trooper Mullen testified that he observed the darkened rear windows on Defendant's car as it drove past and concluded based on his training and

experience investigating window tint violations that Defendant's windows were in violation of Georgia's 32 percent legal limit.

It is undisputed that Trooper Mullen's reference to a window tint violation was a pretextual basis for a stop motivated by other reasons, that is, the FBI's desire to investigate Defendant's drug trafficking conduct. Defendant does not suggest, however, that the pretextual nature of the stop itself suggests a Fourth Amendment violation. After all, the Supreme Court has long held that "the constitutional reasonableness of traffic stops [does not] depend[ ] on the actual motivations of the individual officers involved." *Whren v. United States*, 517 U.S. 806, 813 (1996).

Instead, Defendant argues that Trooper Mullen did not actually have reasonable suspicion of a window tint violation. Defendant argues that "the officer could see Mr. Jackson in the vehicle, the officer did not write in his report the window tint appeared to be illegal, only dark; and there was no follow up on the suspicion to confirm as well as no citation issued for violating the law." Def. Br. [395] at 6. Defendant also points out that Mullen did not investigate the window tint issue upon stopping the car, including by confirming the percentage of light allowed through the window with a tint meter. *Id*. at 3, 8.

The Court finds in the Government's favor on this issue. Trooper Mullen offered sworn testimony that, based on his observations and experience, he

believed that the rear windows of Defendant's car were illegally dark. That Mullen failed to investigate or issue any citation for this violation, or simply described the windows as "dark" instead of "illegal" in his report, are of little significance given the pretextual nature of this stop. These omissions do not by themselves refute Mullen's claimed observations, in other words, because it was not his purpose to investigate or prosecute those issues or enforce those provisions. Nor was Mullen's ability to see Defendant in the car inconsistent with his claim of observing a window tint violation. Indeed, the suspected violation was only as to the rear windows of the car. Thus, the Court credits the Trooper's testimony as to his observations and finds that he at least reasonably suspected a window tint violation, which observations would have permitted the traffic stop.[2]

---

[2] Moreover, independently, the FBI, which was in communication with and had provided a summary of its investigation to the GSP Troopers, had probable cause to arrest Defendant based on the drug trafficking operation. While there was no indication that Defendant was in the midst of trafficking drugs at the moment of the stop itself, the FBI had sufficient grounds to arrest him based on their knowledge of his prior criminal activity, including but not limited to the texts discussing drug trafficking with Battle, the surveillance of Defendant's apparent handling of drug-related packages, and presence of his fingerprints on at least one narcotics shipment that originated from Battle's safe house. Such probable cause to arrest Defendant, within the collective knowledge of the officers, would have been independent grounds to stop the vehicle regardless of the transparency or opaqueness of the rear windows.

**B.** ***Defendant's Statements And The Car Search Were Not The Result Of An Unreasonably Delayed Detention***

The duration of an investigatory traffic stop must be limited to the time necessary to effectuate the investigative purposes of the stop. *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2002) (citing *United States v. Pruitt*, 174 F.3d 1215, 1219-20 (11th Cir. 1999)). In other words, a stop predicated solely on investigation of possible violations may not last any longer than reasonably necessary to investigate and process the traffic violations unless there is articulable suspicion of other legal activity, or the encounter has become consensual. *See United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003) (citing *Purcell*, 236 F.3d at 1277).

However, the Court of Appeals has made clear that lawfully-initiated traffic stops can usually be expected to last several minutes for basic investigatory purposes. As *Purcell* explained:

> In this case, the district court determined that Shon Purcell consented to a search of his car approximately fourteen minutes into the traffic stop. These initial fourteen minutes, therefore, are the only ones relevant to a determination whether the duration of the traffic stop was reasonable. Fourteen minutes is not an unreasonable amount of time for a traffic stop. We have approved traffic stops of much longer duration. *See Hardy*, 855 F.2d at 761 (approving traffic stop of fifty minutes duration). *See also United States v. Shareef*, 100 F.3d 1491, 1502 (10th Cir.1996) (30 minute wait for computer check during a traffic stop reasonable). *Cf. United States v. Place*, 462 U.S. 696, 709,

> 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (90 minutes "probably" too
> long for a *Terry* stop).

*Purcell*, 236 F.3d at 1279.

Defendant argues that any investigatory stop based on a mere window tint violation would not have warranted a delay for purposes of an FBI interview and ultimately K-9 sniff and car search. This argument is meritless, however, given the brief timeframe involved here. The record shows that S/A O'Brien began consensually interviewing Defendant within just a few minutes of the initiation of the stop. Draco's open-air sniff procedure also began just six minutes after the initiation of the stop, and lasted less than one minute. Thus, all of this occurred just minutes into the stop, well within the reasonable timeframe of a traffic stop based on even the most minor of suspected violations.

At the point where Draco alerted to the presence of narcotics—less than seven minutes into the stop—the scope of the investigation would have no longer been limited to whatever timeframe would normally be expected to investigate a mere window tint violation. Instead, at that juncture, the officers had probable cause to suspect the presence of narcotics in the car, justifying far more extensive investigative steps including a search. Given the *de minimus* duration of the traffic

stop by the point of this alert, the Court sees no Fourth Amendment violation based on the duration of the traffic stop.[3]

### C. *The Search Of The Car Was Justified By The Automobile Exception*

Probable cause exists to conduct a warrantless search when "there is a fair probability that contraband or evidence of a crime will be found in the vehicle" under the totality of the circumstances. *United States v. Tamari*, 454 F.3d 1259, 1261–62 (11th Cir. 2006) (citations omitted). Probable cause requires more than a mere suspicion but does not require the same "standard of conclusiveness and probability as the facts necessary to support a conviction." *United States v. Dunn*, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)).

There is no dispute here that Defendant's car was readily-operable for purposes of the automobile exception. As for probable cause, a traffic stop based on reasonable suspicion can escalate into a finding of probable cause justifying a search under the automobile exception, based on facts obtained during the stop. For example, probable cause can arise based on a positive alert by a dog specially trained to detect the odor of narcotics. *United States v. Dunkley*, 911 F.2d 522, 527

---

[3] Regardless, this issue is moot because, again, the FBI independently had probable cause to and did arrest Defendant for having committed drug trafficking violations. Thus, Defendant's seizure was not necessarily limited in duration to the reasonable scope of a traffic violation investigation.

(11th Cir. 1990); *United States v. Tamari*, 454 F.3d 1259, 1264-65 (11th Cir. 2006). The courts have made clear that the use of a drug detection dog to sniff the open air in a public place (such as that around a vehicle on a public roadway) is not itself considered to be a search for Fourth Amendment purposes. *See United States v. Place*, 462 U.S. 696, 706-07 (1983) (use of a "canine sniff" by a trained narcotics dog is not a search within the meaning of the Fourth Amendment because it is much less intrusive than a typical search); *Hearn v. Bd. Pub. Educ.*, 191 F.3d 1329, 1332 (11th Cir. 1999) ("A dog sniff of a person's property located in a public place is not a search within the meaning of the Fourth Amendment.") (collecting cases).

The Courts, of course, are not to blindly accept conclusory assertions as to what a dog's conduct means. While there is no specific litmus test by which to consider the probative value of a canine "open air sniff", the Court must generally consider the dog's training and other evidence of the reliability of the alert in the totality of the circumstances. *See Florida v. Harris*, 568 U.S. 237, 246-47 (2013).

In this case, the Court heard credible testimony from Trooper Mullen as to the regular training that he and Draco undertake and the annual certifications that they successfully obtain regarding detection of drug odors. Mullen also testified in detail, with reference to video footage that was displayed at the hearing, to explain Draco's process and method of alerting in this case. The Court thus credits that Draco altered to the likely presence of drugs in Defendant's car. While this fact

would suffice to show probable cause, the likelihood of the presence of drug-related evidence was even greater in light of all the facts known to the collective group of investigators as to Defendant's involvement in drug trafficking. The GSP officers were thus permitted to search the car.[4]

Defendant appears to secondarily argue that, even if the officers were permitted to search the car, they had no basis to seize the three cell phones and the gun found inside the car based on what the search revealed to simply be a

---

[4] In a confusing moment referenced in the transcript, the dashboard camera footage showed that before Officer Mullen and Draco conducted their open-air sniff, two other individuals opened and appeared to begin to momentarily enter the car. *See* Tr. at 80. This was prior to any probable cause established by any open-air sniff. S/A O'Brien explained that those individuals were himself and a FBI task force officer working with him. *Id*. According to S/A O'Brien, he had asked the Defendant whether he (O'Brien) could retrieve Defendant's phone from the car, and Defendant initially agreed. S/A O'Brien explained that he momentarily opened the car for the purpose of retrieving the phone but then immediately pulled back from entering because Defendant quickly retracted his consent for O'Brien to retrieve the phone. *Id.* S/A O'Brien did not recall whether he had actually seen any phone during that brief moment, and testified that he independently knew based on Defendant's statements that there was at least one phone in that car. *Id.* at 102-103. GSP Officer Mullen also testified that his decision to conduct an open-air sniff was not impacted by any information learned from the agents opening the car door. *See* Tr. at 41. As a result of O'Brien's actions, the passenger door of the car was open at the time when Draco went around the car to conduct his sniff, although both front windows were open already at the time of the stop. *Id*. at 12.

The Court does not find that these circumstances change the propriety of the automobile search. It does not appear from this record that the decision to conduct a sniff or the results of that operation were affected by the FBI opening of the door, and it appears that this action was done at least initially with the Defendant's consent. Defendant does not show otherwise on these points.

possession-level amount of marijuana. According to Defendant, in other words, these items were not apparent evidence of any marijuana possession offense or window tint offense.

Defendant, however, misunderstands the permissible scope of the search under the automobile exception. *See United States v. Ross*, 456 U.S. 798, 825 (1982) ("We hold that the scope of the warrantless search authorized by [the automobile] exception is no broader and no narrower than a magistrate [judge] could legitimately authorize by warrant."). Once lawfully inside the vehicle based on the probable cause of the presence of narcotics, the officers were permitted to seize any evidence of such an offense or any container likely to contain evidence of such an offense, or any other item in plain view that they had probable cause to believe was or contained evidence of other criminality. Here, the investigators collectively knew that Defendant was engaged in significant drug trafficking on behalf of a drug trafficking organization and specifically knew that he used cell phones as an integral part of his operations because they had already discovered multiple incriminating text communications between him and Battle. It is also well known that cell phones and guns are common tools of drug trafficking operations,

and seizure of such evidence in plain view is routinely upheld where officers have probable cause to believe a premises is used for such operations.[5]

Moreover, as to the multiple cell phones found in Defendant's car, the agents did not go so far as to search those devices based merely on the automobile exception. Rather, S/A O'Brien explained that although they *seized* this apparent evidence from the readily-mobile vehicle, they did not conduct any searches and intrude on any content within the phone until obtaining a search warrant for that

---

[5] *See, e.g., United States v. Lisbon*, 835 F. Supp. 2d 1329, 1363 (N.D. Ga. 2011) (upholding the seizure of cell telephones pursuant to the plain view doctrine, noting that "the Eleventh Circuit and numerous other federal appellate courts recognize that cell phones are 'a known tool of the drug trade,'" especially in a case where "drug conspirators were shown to utilize cell phones to communicate with one another.") (citations omitted), *aff'd sub nom. United States v. Moreno*, 559 F. App'x 940 (11th Cir. 2014); *United States v. Jaimez*, 15 F. Supp. 3d 1338, 1343 (N.D. Ga. 2013) (finding "that the incriminating nature of the cellular phones was immediately apparent" in a case involving wiretaps, indicating use of phones, and where several phones were located in one place, "suggesting in this context that the phones were used for drug sales"), *aff'd in part*, 571 F. App'x 935 (11th Cir. 2014); *United States v. Meador*, 2008 WL 4922001, at **14-15 (E.D. Mo. January 7, 2008) (upholding plain view seizure of cell phones, "well-known and recognized tools of the drug dealing trade[,]" when found in the defendant's vehicle along with marijuana, when the defendant was implicated in marijuana trafficking, and when there was evidence of usage of the cell phone); *see also United States v. Prather*, 279 Fed. App'x 761, 766 (11th Cir. 2008) ("When law enforcement officers stumble across hidden guns during a lawful search for drugs, they are allowed to draw the reasonable inference that the guns may be related to drug trafficking occurring at the location.") (citation omitted); *United States v. Acosta*, 807 F. Supp. 2d 1154, 1261 (N.D. Ga. 2011) ("Due to the fact that firearms are tools of the drug trade, the firearms were properly seized as evidence in plain view.") (citations omitted).

purpose. *See* Tr. at 105. The Court finds this approach to have been in compliance with the bounds of the automobile exception and therefore that no grounds exist to suppress any material obtained from within the car.

### D. Defendant's Statements Were Voluntary And In Compliance With *Miranda*

In *Jackson v. Denno*, the Supreme Court held that when a defendant objects to the introduction of a statement to law enforcement as involuntary, due process requires the trial court to make an independent determination that the statement was voluntary before it may be heard by the jury. 378 U.S. 368 (1964). A two-part inquiry determines the admissibility of a self-incriminating statement. *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994). First, the court must consider whether the Government complied with the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966). *See id*. Second, the court must consider whether the statement was voluntary. *Id.* (citing *United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983)).

In *Miranda*, the Supreme Court held that a suspect in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation. 384 U.S. at 444. The Government has the burden to

show the knowing and intelligent nature of a *Miranda* waiver. *Id*. at 475 (citations

omitted).  The Supreme Court instructs courts to look for two things:

> First, the relinquishment of the right must have been voluntary in the
> sense that it was the product of a free and deliberate choice rather than
> intimidation, coercion, or deception. Second, the waiver must have
> been made with a full awareness of both the nature of the right being
> abandoned and the consequences of the decision to abandon it. Only if
> the totality of the circumstances surrounding the interrogation reveal
> both an uncoerced choice and the requisite level of comprehension
> may a court properly conclude that the *Miranda* rights have been
> waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation marks and

citations omitted).

Determining whether a statement and/or waiver is voluntary depends on

whether, under all of the surrounding circumstances, the statement was the product

of the accused's "free and rational" choice. *Jones*, 32 F.3d at 1516 (citing *Arizona*

*v. Fulminate*, 499 U.S. 279, 285-88 (1991)) (other citation omitted). The Eleventh

Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an
> exhaustingly long interrogation, the application of physical force or the
> threat to do so, or the making of a promise that induces a confession.
> Isolated incidents of police deception, and discussions of realistic penalties
> for cooperative and non-cooperative defendants, are normally insufficient to
> preclude free choice.

*Jones*, 32 F.3d at 1517 (quoting *United States v. Mendoza–Cecelia*, 963 F.2d 1467,

1475 (11th Cir.), *abrogation on other grounds recognized by United States v.*

*Grenon*, 2025 WL 3708752, at *7 (11th Cir. Dec. 22, 2025)).

In this case, S/A O'Brien testified that the interview with Defendant began within just a few minutes of the traffic stop, and that he (O'Brien) immediately read Defendant his *Miranda* rights before proceeding. According to O'Brien, Defendant appeared to understand his rights and agreed to speak notwithstanding his rights. Although Defendant was in handcuffs at the time, he was not subjected to lengthy detention at this point and O'Brien testified without contradiction that there were no threats or promises made or acts of intimidation. Indeed, as noted above, after initially consenting to O'Brien retrieving Defendant's phone from the car, the Defendant quickly retracted that consent and O'Brien complied by refraining from continuing to enter the car. *See* Tr. at 80. That Defendant actually knew that he could, and did, withhold this consent, and that he saw that O'Brien complied, suggests that Defendant understood his rights and that he knew he could decline to speak if he so wished.

Defendant's main argument against a finding of voluntariness and/or that the FBI complied with its *Miranda* obligations, is that S/A O'Brien did not obtain a signed and written waiver form from Defendant. In other words, O'Brien relied solely on his testimony in Court to establish that he read Defendant his *Miranda* rights and that Defendant subsequently waived those rights and agreed to speak.

Of course, a signed and written waiver form would have been additional and stronger evidence on this point. S/A O'Brien, however, testified that the

Defendant's hands were cuffed behind his back, and that the officers decided not to undo those restraints for purposes of safety. *See* Tr. at 98. Moreover, S/A O'Brien's testimony is not contradicted on this point by any other witness. The Court on this record finds that Defendant's statements were voluntarily-made and in compliance with *Miranda*.

### III.   CONCLUSION

Thus, the undersigned **RECOMMENDS** that the Defendant's Motions [297] [298] be **DENIED**. This case is ready for trial as to this Defendant.

IT IS RECOMMENDED this 9th day of March, 2026.

_____

JUSTIN S. ANAND

UNITED STATES MAGISTRATE JUDGE